## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| KAMAU ALFAHIYM MUNTASIR, | : | |
| | : | |
| Petitioner, | : | Civ. No. 15-754 (KM) |
| | : | |
| v. | : | |
| | : | |
| UNITED STATES OF AMERICA, | : | **OPINION** |
| | : | |
| Respondent. | : | |

## KEVIN MCNULTY, U.S.D.J.

### I.    INTRODUCTION

Petitioner, Kamau Alfahiym Muntasir, is a federal prisoner proceeding pro se with a

motion to vacate, set aside, or correct his sentence under 28 U.S.C. § 2255. For the following

reasons, Mr. Muntasir's § 2255 motion will be denied.

### II.    BACKGROUND AND PLEADINGS

#### A.  The Underlying Criminal Proceeding

District Judge Dennis M. Cavanaugh, who presided over the original criminal

proceedings, described the underlying facts as follows:

> Defendant [Mr. Muntasir] was arrested in a previous case
> on September 18, 2008 and charged with two counts of illegal
> distribution of crack cocaine. Defendant appeared for five distinct
> proffer sessions at the United States Attorney Office in Newark in
> the Fall and Winter of 2008 and 2009 but no agreement was
> reached. On January 11, 2010, Defendant pled guilty to the second
> count of the indictment in that case, charging him with conspiracy
> to possess with intent to distribute cocaine. Defendant was
> sentenced to a prison term of 151 months on July 26, 2010.
> Defendant was designated to serve his sentence at a federal
> correctional facility in Butner, North Carolina ("FCI-Butner"). The
> United States alleges that on or about September 2011, while
> incarcerated at FCI-Butner, Defendant initiated discussions with
> fellow FCI-Butner inmate, Thomas Grady Brown, about a potential

transaction involving 25 kilograms of cocaine. The United States further alleges that Defendant's purpose in initiating the discussion with Brown was to obtain a drug supplier for his friend Eugene "Wali" Braswell, who resided in New Jersey. The United States possesses and has produced a series of phone calls beginning on or around September 2011 and ending in March 2012, in which Defendant and Braswell discuss the cocaine deal. During the course of these calls, the United States alleges Defendant informed Braswell about his discussions with Brown, when Braswell could expect a call from Brown's associates, the price of the cocaine, and the profits each would receive from the deal.

On or about December 2011, Mike Mechalske, a Special Investigative Service Technician with the Bureau of Prisons staffed at FCI-Butner, notified the Federal Bureau of Investigations ("FBI") of what he believed to be a conspiracy between Muntasir and Braswell to purchase 25 kilograms of cocaine. Pursuant to an FBI sting operation and during the course of a recorded phone conversation, an undercover FBI agent contacted and arranged to meet Braswell in New Jersey on March 16, 2012, for the ostensible purpose of delivering the agreed-upon 25 kilograms of cocaine. When Braswell and the undercover agent met, Braswell requested that the first sale be for one kilogram in exchange for payment of $14,000 and showed the undercover officer a collection of $100 bills. Braswell was then arrested and charged in a one-count complaint with conspiracy to distribute and possess with intent to distribute 5 kilograms or more of cocaine. Braswell pled guilty on March 16, 2012.

After Braswell's arrest, federal prosecutors attempted to gain Defendant's cooperation against individuals with pending federal and state charges in New Jersey but Defendant declined to participate. Defendant was subsequently transported to New Jersey and further attempts by the government to elicit Defendant's cooperation yielded the same result.

*United States v. Muntasir*, Crim. No. 12-524 (DMC), Op. (Oct. 16, 2012), ECF No. 15, at 2–4

(internal citations and footnotes omitted).

In August 2012, a grand jury indicted Mr. Muntasir for conspiracy to distribute cocaine,

under 21 U.S.C. §§ 841(a)(1), 841(b)(1)(A)(ii), and 846. Crim. No. 12-524, ECF No. 10. Mr.

Muntasir pleaded not guilty at his arraignment. Crim. No. 12-524, ECF No. 11. Judge

Cavanaugh then issued an Order for Discovery and Inspection, which, among other things,

ordered the government, within ten days, to permit defense counsel to inspect or reproduce all disclosure evidence encompassed by Federal Rule of Criminal Procedure 16(a)(1), all *Brady* material, and all *Bruton* material ("the Discovery Order"). Crim. No. 12-524, Order for Disc. & Inspection, ECF No. 12, ¶ 1. With regard to Jencks and *Giglio* material, the Discovery Order simply required the government to produce such materials "sufficiently in advance of the witness's testimony to avoid delay in the trial." *Id.* ¶ 4.

On September 21, 2012, Mr. Muntasir, by his counsel, Michael V. Gilberti, filed motions for various forms of pretrial relief. Crim. No. 12-524, Mots., ECF No. 13. Gilberti argued that the case should be dismissed based on over-involvement by the government in orchestrating the drug deal, or at least that an evidentiary hearing should be held on this topic. Crim. No. 12-524, Br. in Supp., ECF No. 13-1, at 6–7. He further sought a bill of particulars, arguing that the indictment provided no specific information concerning the charge. *Id.* at 8–10. Gilberti noted that, while the government had produced some discovery, it appeared that portions were missing, and he accordingly moved the Court to order complete production under the Discovery Order. *Id.* at 11–14. Among other items, he specifically urged that the government had failed to identify alleged coconspirators or produce recorded conversations between an identified coconspirator and an undercover agent. *Id.* at 11. He sought production of *Brady* and *Agurs/Giglio* material, noting that it appeared from the filings that at least one coconspirator was cooperating with the government. *Id.* at 11–13.

At an October 15, 2012 hearing, Gilberti withdrew the motion seeking a bill of particulars and reached agreements with the government concerning the discovery motions, leaving only the dismissal motion still pending. Crim. No. 12-524, ECF No. 15 at 1–2. Judge Cavanaugh then

denied the dismissal motion, finding that the government's conduct did not rise to the level of outrageousness. *Id.*

Mr. Muntasir alleges that, during a meeting sometime following the October 15 hearing, Gilberti relayed a plea offer for up to twenty years with the possibility of the sentence running concurrently with his prior 151-month sentence that he was currently serving. (Mot., ECF No. 1, Mem. of Law, at 5–6.) Mr. Muntasir indicates that he rejected this plea based on his beliefs that the sentence could not run concurrently with his prior sentence and that the government had engaged in misconduct. (*Id.* at 6.) He asserts that Gilberti told him, "Something stinks about this case, but are you willing to risk your life to find out?" (*Id.*) Mr. Muntasir apparently told Gilberti that he would go to trial, and Gilberti said he would seek a better plea deal. (*Id.*)

Mr. Muntasir indicates that Gilberti called him a few days later and said that the government had made an offer of eighty-four months' imprisonment, to run consecutive to his prior sentence. The offer would remain open, however, only until 5:00 p.m. that day. (*Id.*) Mr. Muntasir reports that when he expressed concerns about governmental misconduct, Gilberti advised him that it was "an excellent deal and that it wasn't worth risking at least fo[]rty more years in prison if [he] were to try the case" and, further, that no better plea deal would be offered. (*Id.* at 6–7.) Accordingly, Mr. Muntasir agreed to accept the offer. (*Id.* at 7.) He indicates that when he was signing the plea paperwork, Gilberti told him "that something was seriously wrong with the case especially with such a plea offer on the table." (*Id.*)

During a plea hearing on November 7, 2012, Mr. Muntasir backtracked. He expressed reservations about the plea deal because of his uncertainty about the scope of an included waiver of appellate rights. *See* Crim. No. 12-524, Tr. of Nov. 7, 2012 Hr'g, ECF No. 33, at 17–25. After some discussion with counsel for both sides, Judge Cavanaugh adjourned the hearing for a week

4

to give Mr. Muntasir more time to discuss the proposed appellate waiver with Gilberti. *Id.* at 24–28.

Following this, Gilberti apparently explained to Mr. Muntasir that the appellate waiver would prevent him from raising any subsequently discovered governmental misconduct. (ECF No. 1, Mem. of Law at 8.) Mr. Muntasir recounts that, while Gilberti agreed that something "stunk" about the case, he "presented the question of was it worth the risk of trying to find out the extent of the alleged misconduct." (*Id.*)

At a renewed hearing on November 13, 2012, Mr. Muntasir indicated that, after further consultation with Gilberti, he was not willing to waive his appellate rights, and consequently would not accept the plea offer. Crim. No. 12-524, Tr. of Nov. 13, 2012 Hr'g, ECF No. 31, at 3–4. The government indicated that it therefore considered the offer withdrawn. *Id.* at 4.

During this hearing, Gilberti also indicated that he was hoping to receive hard copies of extensive *Giglio* (*i.e.,* witness impeachment) material that the government "wanted [him] to come over and look at." *Id.* at 5. The government indicated that production had been put on hold while the plea offer was pending, but offered to make the materials available the following day. *Id.* at 5–6. Ultimately, Judge Cavanaugh directed the government to deliver hard copies of the material to Gilberti by the following day, as well as a list of anything not produced so that Gilberti could raise any relevant challenges. *Id.* at 8. Judge Cavanaugh set a trial date of November 27, 2012. *Id.* at 5.

The government produced hard copies of the additional *Giglio* material to Gilberti the following day, and Gilberti brought it to the jail to discuss with Mr. Muntasir. (ECF No. 1, Mem. of Law at 9.) Presented with this evidence, Gilberti apparently told Mr. Muntasir that the case was "virtually undefendable." (*Id.*) Accordingly, Gilberti advised Mr. Muntasir to plead to the

5

charge. (*Id.*) Mr. Muntasir then told Gilberti he would accept the initial plea deal of eighty-four months and asked Gilberti to "file a complaint against the government for its failure to disclose favorable material to the defense with the initial release of discovery." (*Id.* at 9–10.) Later that day, Gilberti told Mr. Muntasir that the government would not reoffer the 84-month deal, but that it would offer a 120-month deal. (*Id.* at 10.) Mr. Muntasir represents that he again asked Gilberti to seek relief from the Court regarding governmental misconduct, but that Gilberti said that such a motion would not be successful. (*Id.*) Later that day, Mr. Muntasir agreed to accept the 120-month deal. (*Id.* at 10–11.) Mr. Muntasir appeared before the Court to enter his guilty plea on November 20, 2012. Crim. No. 12-524, ECF Nos. 20–22.

On April 8, 2013, Judge Cavanaugh sentenced Mr. Muntasir to 120 months of imprisonment followed by five years of probation. Crim. No. 12-524, J., ECF No. 27. Mr. Muntasir filed a notice of appeal with the U.S. Court of Appeals for the Third Circuit on April 10, 2013. Crim. No. 12-524, Notice of Appeal, ECF No. 23. Gilberti, "upon conferring with [Mr. Muntasir]," subsequently withdrew the appeal, and the Third Circuit dismissed it on November 8, 2013. (ECF No. 1, Mem. of Law at 11–12); Crim. No. 12-524, Order of 3d Cir., ECF No. 34.

### B. The § 2255 Motion

Mr. Muntasir, acting pro se, filed a § 2255 motion to vacate, set aside, or correct his sentence. (ECF No. 1.) The motion, dated January 26, 2015, was filed by the Court on February 3, 2015. In this motion, he alleges ineffective assistance of counsel on three bases. (*See* ECF No. 1, Mem. of Law.) He first argues that Gilberti was ineffective in "failing to seek and obtain all evidence favorable to the defense prior to presenting and allowing [Mr. Muntasir] to enter into plea negotiations with the prosecution, entertaining a plea before the court, and subsequently rejecting said plea causing prejudice to petitioner." (*Id.* at 12–16.) Essentially he alleges that

Gilberti should not have moved forward with the initial plea discussions without the benefit of full discovery from the government. (*Id.*) Lacking such discovery, Mr. Muntasir rejected a plea offer of 84 months' imprisonment, only to subsequently accept an offer of 120 months. (*Id.*) He next alleges that Gilberti was ineffective in that he failed to raise any issues of government misconduct with the Court, particularly whether the government had improperly failed to produce discovery or to reinstate the 84-month plea offer. (*Id.* at 16–20.) Mr. Muntasir claims that the withheld discovery material "was critical to defenses case and petitioners plea to the charges." (*Id.* at 16.) Finally, Mr. Muntasir argues that Gilberti was ineffective in that he erroneously advised Mr. Muntasir that an appellate waiver would prevent him from subsequently raising newly discovered evidence or issues (*Id.* at 20–23.) Mr. Muntasir contends that it was based on this erroneous advice that he rejected the 84-month plea offer. (*Id.*)

The government responds that Mr. Muntasir's motion is untimely, as it was filed more than a year after his judgment became final. (*Letter Br. in Resp.*, ECF No. 5, at 2–3.) It further argues, in the alternative, that Mr. Muntasir cannot show ineffective assistance of counsel, because the government did not improperly withhold discovery and Mr. Muntasir had ample opportunity to consider the 84-month deal. (*Id.* at 3–4.) It adds that Mr. Muntasir has failed to identify any allegedly withheld materials that emerged between the 84-month offer and the 120-month offer, or to specify what other relief Gilberti should have sought. (*Id.*) The government points out that Gilberti in fact urged Muntasir to accept the 84-month deal. (*Id.*) Finally, the government argues that Mr. Muntasir has failed to identify any specific deficiency in Gilberti's advice concerning his appellate rights, and it notes that the ultimate 120-month plea agreement included the same appellate-waiver language as the rejected 84-month deal. (*Id.*)

Mr. Muntasir argues, in reply, that his § 2255 motion was not untimely, as the one-year period to file it began with the expiration of his time to seek certiorari from the Supreme Court, not from the date of dismissal by the Court of Appeals. (Reply, ECF No. 6, at 2–3.) He urges that the transcript shows that Gilberti did not have all discovery while the 84-month offer was being considered, and asserts that Gilberti had thus failed to subject the case to sufficient adversarial testing. (*Id.* at 5–6.) Mr. Muntasir contends that Gilberti erroneously told him that the appellate-waiver provision was "inextricabl[y] intertwined with the plea," and that, contrary to Gilberti's advice, various court rules permit litigants to raise arguments based on newly discovered evidence. (*Id.* at 6, 9–10.) He asserts that Gilberti's "insistence on Petitioner taking a plea offer, regardless of how good of a deal counsel felt it was, before acquisition and inspection of all discovery did not accord Petitioner the benefit of his right to effective assistance of counsel." (*Id.* at 7.)

### III.    LEGAL STANDARD

To grant relief on a federal prisoner's motion to vacate, set aside, or correct a sentence under 28 U.S.C. § 2255, the Court must find that "there has been such a denial or infringement of the constitutional rights of the prisoner as to render the judgment vulnerable to collateral attack." 28 U.S.C. § 2255(b). "In considering a motion to vacate a defendant's sentence, 'the court must accept the truth of the movant's factual allegations unless they are clearly frivolous based on the existing record.'" *United States v. Booth,* 432 F.3d 542, 545 (3d Cir. 2005) (quoting *Gov't of V.I. v. Forte,* 865 F.2d 59, 62 (3d Cir. 1989)). A district court "is required to hold an evidentiary hearing 'unless the motion and files and records of the case show conclusively that the movant is not entitled to relief.'" *Id.* (quoting *Forte,* 865 F.2d at 62).

## IV.   TIMELINESS

Motions under § 2255 are subject to a one-year limitations period, which begins to run on the latest of

> (1) the date on which the judgment of conviction becomes final;
> (2) the date on which the impediment to making a motion created by governmental action in violation of the constitution or laws of the United States is removed, if the movant was prevented from making a motion by such governmental action;
> (3) the date on which the right asserted was initially recognized by the Supreme Court, if that right has been newly recognized by the Supreme Court and made retroactively applicable to cases on collateral review; or
> (4) the date on which the facts supporting the claim or claims presented could have been discovered through the exercise of due diligence.

28 U.S.C. § 2255(f). There is no implication that there was an improper governmental impediment to commencing this proceeding. Nor does Mr. Muntasir base his motion upon a newly recognized right or newly discovered facts. (*See* ECF No. 1.) Accordingly, the one-year limitations period began to run when Mr. Muntasir's judgment became final. The question presented here is whether (a) it became final when the Third Circuit granted Mr. Muntasir's motion to voluntarily dismiss his appeal, or (b) it became final 90 days after that, representing the time generally permitted to petition for certiorari from the Supreme Court. *See* 28 U.S.C. § 2101(c); Sup. Ct. R. 13.

A federal criminal judgment typically becomes final when the Supreme Court affirms the judgment or denies a timely petition for certiorari, or when the time to petition the Supreme Court for certiorari expires. *Kapral v. United States*, 166 F.3d 565, 577 (3d Cir. 1999). In the absence of a timely direct appeal, the judgment becomes final when the time to file a direct appeal expires. *Id.* The government argues, however, that when an appellant moves to voluntarily dismiss a direct appeal, the judgment becomes final when that motion is granted.

(ECF No. 5 at 3.) A defendant who withdraws his or her own appeal may be seen as waiving the possibility of certiorari review. Mr. Muntasir stresses, however, that voluntary dismissal of a direct appeal does not wholly foreclose the possibility of a writ of certiorari from the Supreme Court, and that therefore the judgment does not become final (and the period to file a § 2255 motion does not start running) until 90 days later.

Non-precedential decisions of two panels of the United States Court of Appeals for the Third Circuit have given inconsistent answers to this question. In *United States v. Sylvester*, 258 F. App'x 411 (3d Cir. 2007), the Court reversed a district court's grant of a certificate of appealability on this very issue, finding it "not reasonably debatable" that a "conviction became final and the limitations period began to run when [petitioner's] appeal was voluntarily dismissed." *Id.* at 412. "When an appeal is voluntarily dismissed," the Court reasoned, "further direct review is no longer possible." *Id. United States v. Parker*, 416 F. App'x 132 (3d Cir. 2011), while not rejecting *Sylvester* explicitly, at least strongly implies the opposite view. There, the Court lauded the government's withdrawal of its argument that the petition was untimely, observing that "no known precedent for the proposition that a criminal defendant who seeks voluntary dismissal of an appeal is foreclosed from filing a petition for certiorari challenging the dismissal." *Id.* at 132.[1]

---

[1]     If the Third Circuit is of two minds on this issue, it is not alone in that. *See Adair v. Tucker*, No. 5:12-CV-00346-MP-GRJ, 2014 WL 2805227, at *2 (N.D. Fla. June 20, 2014) ("Courts both within and outside the Eleventh Circuit have reached different conclusions on whether petitioners who voluntarily dismiss their appeals are entitled to the 90-day period to petition for a writ of certiorari in the Supreme Court of the United States, or whether their convictions become final on the day their appeal is dismissed.")

Mr. Muntasir filed his § 2255 motion on February 3, 2015.[2] If Mr. Muntasir's judgment of conviction became final when the Third Circuit granted voluntary dismissal, then his last day to file a timely § 2255 motion was November 8, 2014, and the petition came too late. Contrariwise, if he is entitled to the benefit of the 90 day deadline to petition the Supreme Court for certiorari, then his last day to file a § 2255 motion was February 6, 2015, and his filing was timely. When precedential panel holdings conflict, and the question has not been addressed en banc, the earlier decision controls. *See United States v. Tann*, 577 F.3d 533, 541 (3d Cir. 2009); *Pardini v. Allegheny Intermediate Unit*, 524 F.3d 419, 426 (3d Cir. 2008). Here, however, neither *Sylvester* nor *Parker* is precedential, so the first-filed rule would not seem to carry much force. I therefore consider both for their persuasive value.

An orderly system of review requires that a court postpone consideration of a judgment that is still subject to further revision. Finality, then, is the touchstone and starting point for the statute of limitations analysis. The general rule is that a federal conviction becomes final upon the expiration of the time to file a petition for certiorari (or if certiorari is sought and denied, on the date of denial). *See Clay v. United States,* 537 U.S. 522 (2003).

If it is appropriate to create exceptions to that general rule, this situation would seem to present a good candidate. When a defendant has voluntarily withdrawn his or her own direct appeal, waiting out the period to file a certiorari petition would seem to serve little purpose. Without any ruling on the merits, there is probably nothing very meaningful for the U.S. Supreme Court to review. Still, *Parker* raises the possibility that a defendant might raise an issue as to the voluntariness of his waiver of appellate review. And the Seventh Circuit, for its part,

---

[2]     The deemed filing date could be as early as January 26, 2015, if the so-called "prison mailbox rule" is applied. *See Houston v. Lack,* 487 U.S. 266 (1988). The distinction makes no difference in this case.

accepts that argument, adding that (a) a petition for certiorari requires no more than that the case be "in" the appellate court; and (b) even a prevailing party may petition for certiorari. *Latham v. United States,* 527 F.3d 651, 652–53 (7th Cir. 2008) (Easterbrook, J.) (holding that even where direct appeal is voluntarily dismissed, the judgment of conviction becomes final 90 days later, at the expiration of the deadline to seek certiorari).[3] Those two factors, as it happens, are absent from this particular case; Mr. Muntasir makes no argument that his decision to withdraw the appeal was involuntary, and the United States as "prevailing" party on appeal has not sought certiorari. Under the approach of *Latham,* however, the procedural particulars of Mr. Muntasir's individual case would not seem to matter. *See id.* (noting that the defendant had claimed involuntariness and sought to reinstate his appeal, but that its ruling would have been the same if he had not).

As intimated by *Latham,* the issue is a broader one, involving the proper interpretation of a rule of general application. In some sense, this issue embodies the perennial tension in the law between rules and standards, between a front-loaded decision *ex ante* and a fact-laden decision *ex post.*[4] *See generally,* H.L.A. Hart, The Concept of Law 127–29 (1961); L. Kaplow, "Rules Versus Standards: An Economic Analysis," 42 Duke L.J. 557, 559–62 & n.5 (1992), available at

---

[3]     *See also United States v. Linder*, 552 F.3d 391, 394, 396 (4th Cir. 2009) (where appeal was dismissed on government's motion based on appeal waiver in plea agreement, holding that conviction was not final until expiration of certiorari deadline).

Borderline cases highlight the problem of arbitrariness, or line-drawing. Compare the case of Defendant A, who filed and immediately withdrew a protective notice of appeal, with the case of Defendant B, who opted to forgo taking a direct appeal at all. Under the *Latham* rule, Defendant A might well be entitled to the benefit of the 90 day certiorari period. As to Defendant B, the limitations period would run from the deadline to take a direct appeal. *See Kapral, supra.* Defendant B could, I suppose, analogize to Defendant A's case and attempt to extend the statute of limitations by arguing that his waiver of the right to appeal was not informed and voluntary, or that he hypothetically could have sought and obtained a 30-day extension under Fed. R. App. P. 4(b)(4) before finally opting not to appeal.

[4]     The quintessential example of the distinction is a speed limit of 55 m.p.h. vs. a prohibition of driving at a speed that is excessive given prevailing road and weather conditions.

https://scholarship.law.duke.edu/dlj/vol42/iss3/2. In matters such as filing deadlines, it seems to me that easily applied rules with minimal exceptions are desirable. All that is at stake, after all, is 90 days' time, more or less, to file. So this may be one of the issues for which "it is more important that the applicable rule of law be settled than that it be settled right." *Burnet v. Coronado Oil & Gas Co.*, 285 U.S. 393, 406 (1932) (Brandeis, J., dissenting). A clear, easily administered deadline avoids embroiling the court in questions of whether and to what extent an individual defendant may be responsible (or to blame) for the termination of an appeal, the distinction between waiver and forfeiture, and the quality of legal advice that led to the decision.[5] Indeed, such questions, even when answered, may just spawn further applications for equitable tolling. Under such a regime, *ex post* may become synonymous with *ad hoc*. A clear *ex ante* rule, in this context, better serves the goal of judicial economy, while giving litigants the benefit of the doubt and avoiding the creation of a procedural trap for the unwary.[6]

The better rule, it seems to me, is that the limitations period begins to run 90 days after termination of a direct appeal, regardless of the manner in which the appeal was terminated. The timeliness issue, however, is concededly not free from doubt. Any tribunal that disagrees with my resolution of it may treat the following discussion of the merits of the § 2255 motion as an alternative holding.

---

[5]     For example, if a successful motion to terminate an appeal nullifies the appeal for these purposes, what of a dismissal based on a neglectful failure to prosecute the appeal? What of a deadline missed without obvious fault? What of a dismissal based on counsel's arguments, accompanied by a court's rejection of a defendant's pro se attempt to supplement those arguments? Each might generate its own exceptions or exceptions to exceptions.

[6]     Post-conviction relief is an area of law in which litigants commonly appear *pro se*. It is ironic that in this realm Congress and the courts have collaborated in the construction of a complex procedural labyrinth. For this they they have possessed, and articulated, justifications. But where the law permits us to implement simplifications, even minor ones, it seems worthwhile to do so.

## V.    INEFFECTIVE ASSISTANCE OF COUNSEL

Mr. Muntasir's § 2255 motion is premised on the assertion that his counsel, Mr. Gilberti, was ineffective. The Sixth Amendment guarantees defendants effective assistance of counsel during critical portions of a criminal proceeding. *See Lafler v. Cooper*, 566 U.S. 156, 165 (2012). The Supreme Court, in *Strickland v. Washington*, 466 U.S. 668 (1984), articulated a two-pronged test for demonstrating the ineffectiveness of counsel: (1) that, considering all relevant circumstances, counsel's performance fell below an objective standard of reasonableness and (2) that the petitioner suffered prejudice as a result. *Id.* at 687–96; *see also Grant v. Lockett*, 709 F.3d 224, 232 (3d Cir. 2013). A court may apply the two prongs in either order. 466 U.S. at 697 ("[A] court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies . . . . If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice . . . that course should be followed."); *see also Rainey v. Varner*, 603 F.3d 189, 201 (3d Cir. 2010).

In addressing the first prong, the petitioner "must identify the acts or omissions of counsel that are alleged not to have been the result of reasonable professional judgment." *Strickland*, 466 U.S. at 690. Judicial scrutiny of counsel's conduct must be "highly deferential." *See id.* at 689. "[C]ounsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." *Id.* at 690. The reviewing court must make every effort to "eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Id.* at 689. Counsel's strategic choices made after thorough investigation of the relevant law and facts are "virtually unchallengeable," while choices made with less than entirely thorough investigation "are reasonable precisely to the extent that

reasonable professional judgments support the limitations on investigation." *Id.* at 690–91; *see also Rolan v. Vaughn,* 445 F.3d 671, 682 (3d Cir. 2006); *Gov't of V.I. v. Weatherwax,* 77 F.3d 1425, 1432 (3d Cir. 1996). Whether counsel acted in a manner that was deficient is measured by a standard of "reasonableness under prevailing professional norms." *Strickland,* 466 U.S. at 687–88; *see also Wiggins v. Smith,* 539 U.S. 510, 521 (2003).

The second prong of the *Strickland* test requires the petitioner to affirmatively prove resulting prejudice. *See* 466 U.S at 693. Prejudice is generally found where "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694. A reasonable probability is "a probability sufficient to undermine confidence in the outcome." *Id.; see also McBride v. Superintendent, SCI Houtzdale,* 687 F.3d 92, 102 n.11 (3d Cir. 2012). "This does not require that counsel's actions more likely than not altered the outcome, but the difference between *Strickland's* prejudice standard and a more-probable-than-not standard is slight and matters only in the rarest case. The likelihood of a different result must be substantial, not just conceivable." *Harrington v. Richter,* 562 U.S. 86, 111–12 (2011) (internal quotation marks and citation omitted).

In the context of plea agreements, this prejudice requirement "focuses on whether counsel's constitutionally ineffective performance affected the outcome of the plea process." *Hill v. Lockhart,* 474 U.S. 52, 59 (1985). When a petitioner alleges that the *rejection* of a plea agreement was caused by ineffective assistance of counsel, establishing prejudice requires showing that

> but for the ineffective advice of counsel there is a reasonable
> probability that the plea offer would have been presented to the
> court (*i.e.,* that the defendant would have accepted the plea and the
> prosecution would not have withdrawn it in light of intervening
> circumstances), that the court would have accepted its terms, and
> that the conviction or sentence, or both, under the offer's terms

15

> would have been less severe than under the judgment and sentence
> that in fact were imposed.

*Lafler*, 566 U.S. at 164. Thus, counsel must "give a defendant information sufficient 'to make a reasonably informed decision whether to accept a plea offer.'" *Shotts v. Wetzel*, 724 F.3d 364, 376 (3d Cir. 2013) (quoting *United States v. Day*, 969 F.2d 39, 43 (3d Cir. 1992)); *see also United States v. Vaughn*, 704 F. App'x 207, 212 (3d Cir. 2017); *United States v. Bui*, 795 F.3d 363, 367 (3d Cir. 2015). Counsel's advice concerning a plea offer may be ineffective if it is "so incorrect and so insufficient that it undermined the defendant's ability to make an intelligent decision." *Day*, 969 F.2d at 43.

Mr. Muntasir contends that his rejection of the first, 84-month plea offer resulted from Gilberti's having provided ineffective assistance in three ways: (1) failure to obtain complete discovery while Muntasir was considering the plea offer; (2) subsequently failing to ask the Court to force the government to revive the same plea offer after Muntasir rejected it; and (3) giving Mr. Muntasir an erroneous understanding of the effect of the plea agreement's appellate-waiver provision. (*See* ECF No. 1, Mem. of Law.)

I make two preliminary and general observations with respect to all of the claims.

First, I accept that if Mr. Muntasir could establish that Gilberti's performance was deficient, then it would not be difficult to demonstrate that loss of the first plea offer was prejudicial. There is no question that the 84-month plea deal would have concluded the case on far more favorable terms than the 120-month deal that Muntasir ultimately accepted. *See Lafler*, 566 U.S. at 164. Consequently, I will focus on the first prong, consider whether Gilberti's performance was deficient, and determine whether it caused Mr. Muntasir to reject the first plea offer.

16

Second, while this is not dispositive of his claims, Mr. Muntasir concedes that Gilberti consistently encouraged him to accept—not reject—the first plea offer, despite expressing certain reservations about the case. (*See id.* at 6.) Had he taken Gilberti's advice, in other words, he would have received the benefit of the 84-month deal. At the time, Gilberti "advised petitioner that it was an excellent deal and that it wasn't worth risking at least fo[]rty more years in prison if I were to try the case"; indeed, Gilberti "informed [Mr. Muntasir] that it would not get any better than this plea offer, and even though he believed that something did stink with the case that he believed the witnesses for the government would convince a jury that petitioner was somehow involved." (ECF No. 1, Mem. of Law at 6–7.) Mr. Muntasir further indicates that when he and Gilberti were discussing the ramifications of the appellate waiver after the first plea hearing, Gilberti "once again was in agreement that something 'stunk' about the case, but again presented the question of was it worth the risk trying to find out the extent of the alleged misconduct." (*Id.* at 8.) Gilberti proved prescient; the plea offer, to say the least, did not improve, and Muntasir evidently came around to the view that the case could not be tried to an acquittal. Indeed, Mr. Muntasir's motion seems to concede that Mr. Gilberti's advice was correct, even if only fortuitously so. With the benefit of hindsight, Mr. Muntasir, now seeks to turn back the clock, take Gilberti's advice, and seize the 84-month plea offer. Such regrets, without more, furnish no basis for relief.

### 1. Alleged Failure to Timely Obtain Discovery Materials

Mr. Muntasir first alleges that Gilberti "by failing to properly obtain all discovery material held in possession of the prosecution allowed petitioner to entertain plea negotiations with the prosecution and subsequently appear before the court at a plea Colloquy which resulted in petitioner denying the said plea offer." (ECF No. 1, Mem. of Law at 12.) He urges that

Gilberti had a duty to "properly inform petitioner of the evidence held against him so that he can make informed decisions concerning the case" and that "when counsel fails to properly seek out such evidence favorable to the defense held in the custody of the prosecution counsels performance is deficient." (*Id.*) Mr. Muntasir contends that Gilberti "knew that the prosecution was withholding information from defense counsel and that it was unwilling to release the information" and that, instead of immediately pursuing this withheld discovery, Gilberti waited until after the first plea agreement had been withdrawn to do so. (*Id.*)

Applying the highly deferential examination required by *Strickland*, the Court cannot find that Gilberti's representation was deficient in this respect. *Strickland* held that an attorney "has a duty to make reasonable investigations." 466 U.S. at 691; *cf. United States v. Travillion*, 759 F.3d 281, 293 n.23 (3d Cir. 2014) (noting that "the failure to conduct any pretrial investigation generally constitutes a clear instance of ineffectiveness" (internal quotation marks omitted)). It is clear from Gilberti's September 2012 omnibus motion that he had already obtained significant discovery and that he had proactively addressed discovery deficiencies by moving for further disclosure.[7] *See* Crim. No. 12-524, ECF No. 13. This is hardly the failure to "subject[] the prosecution's case to meaningful adversarial testing" that Mr. Muntasir alleges. (*See* ECF No. 6 at 5.)

It may be that Mr. Muntasir believes that the *prosecution* dragged its feet in the discovery process, or that the *prosecution* was unduly harsh in setting a same-day deadline for acceptance of the 84-month plea offer. *See* p.4, *supra*. That is very different from saying that Mr. Gilberti was ineffective. At any rate, there is no indication that the government was in default of any deadline to produce *Giglio* impeachment material. As noted above, the discovery order required

---

[7] As noted above, Gilberti and the government apparently reached some agreement regarding further production. *See* Crim. No. 12-524, ECF No. 15 at 1–2.

only that it be produced sufficiently in advance of a witness's testimony to prevent delay of trial. *See* p.3, *supra*. Nor does the defendant suggest any legal basis on which Gilberti could have accelerated production or forced the government to keep the original plea offer open while he did so. Failure to accomplish those goals cannot have been such a lapse as to constitute ineffective assistance.

It is common, in fact, for the government to make a plea offer, and to impose a deadline for its acceptance. That can occur far in advance of production of *any* discovery. Indeed, it can occur as early as the day of arrest, and often does, particularly in the case of defendants who wish to cooperate. At any rate, no case, statute, or rule requires production of all *Giglio* material as a prerequisite to a valid plea agreement.

Mr. Muntasir does not contend that Mr. Gilberti failed to discuss with him the extensive discovery that he had already received. The defense was well aware of the essentials of the government's case and the nature of the evidence, including tape recordings of undercover negotiations. Judge Cavanaugh's opinion, quoted at pp. 1-2, *supra*, dated October 16, 2012, is testament to that. It appears that the two went over the evidence and that Gilberti advised Muntasir to accept the limited-time-only plea deal, which he regarded as favorable.[8] Thus, Gilberti provided Mr. Muntasir "information sufficient to make a reasonably informed decision whether to accept a plea offer." *Shotts*, 724 F.3d at 376 (internal quotation marks omitted). That is, he presented all of the information available before the plea offer lapsed. Gilberti's advice

---

[8]    And rightly so. The parties agreed at Mr. Muntasir's final plea hearing that a conviction on the charge would subject him to a mandatory minimum sentence of ten years in prison and a maximum sentence of life in prison. *See* Crim. No. 12-524, ECF No. 30 at 3–4, 5, 8. During the sentencing hearing, Judge Cavanaugh found that Mr. Muntasir's total offense level under the U.S. Sentencing Guidelines was 34 and that his criminal history category was VI, which would typically result in a prescribed sentence of 262 to 327 months—far longer than the 84 month sentence in the first plea deal, or the 120 month sentence in the second. *See* Crim. No. 12-524, Tr. of Apr. 8, 2013 Hr'g, ECF No. 29, at 4–5.

was clearly not "so incorrect and so insufficient that it undermined the defendant's ability to make an intelligent decision." *Day*, 969 F.2d at 43.

Furthermore, even assuming *arguendo* that Gilberti's efforts to obtain discovery had been deficient, Mr. Muntasir does not plausibly allege or demonstrate that any omitted discovery *caused* his rejection of the initial plea offer. Indeed, he has virtually conceded the contrary. At the November 7, 2012 plea hearing, Mr. Muntasir balked at the appellate waiver, and he continues to give that factor primary emphasis in his § 2255 motion. Mr. Muntasir withdrew his consent to the initial plea agreement on the express basis that he did not want to waive his appellate rights. Crim. No. 12-524, ECF No. 31 at 3–4. *See also* 2255 motion, ECF No. 1, Mem. of Law at 8 ("Petitioner decided to reject the plea offer and proceed to trial based upon er[r]oneous advice given to him by counsel concerning the waiver of his right to present any newly discovered evidence in the case based on any government misconduct or any other issues which were newly discovered by petitioner.") & 17 ("After the petitioner withdrew his guilty plea rejecting the 84-month agreement based on erroneous advice concerning petitioners appeal waiver")). In fact, Mr. Muntasir concedes that at the time he was insisting on his right not to plead guilty at all, but to go to trial. (*See* ECF No. 1, Mem. of Law at 16 (petitioner "was determined to proceed to trial and insisted that counsel obtain[] the withheld discovery so that petitioner and counsel could review the missing material and prepare for trial").)[9]

Finally, Mr. Muntasir fails to point to anything in the subsequently produced discovery material that could or would have changed his decision.

---

[9]    Mr. Muntasir's hope, then as now, appears to have been that some evidence would emerge that would furnish the basis for a defense of entrapment or outrageous government conduct. Nothing before the court, then or now, suggests that such a defense would have been viable. Judge Cavanaugh rejected the outrageous conduct defense, which may be asserted before trial, in his October 16, 2012 ruling. *United States v. Muntasir*, Crim. No. 12-524 (DMC), Op. (Oct. 16, 2012), ECF No. 15.

Accordingly, the Court finds that Gilberti did not, by failing to obtain earlier the *Giglio* materials that were subsequently produced, provide ineffective assistance of counsel that caused Mr. Muntasir to reject the initial plea offer.

## 2. Alleged Failure to Petition the Court for Relief

Mr. Muntasir next argues that Mr. Gilberti failed "to timely and appropriately petition, and or move the court concerning the [government's] withholding of critical discovery material without showing cause for the withholding." (ECF No. 1, Mem. of Law at 16.) It is uncontested, however, that Gilberti filed a motion for disclosure and reached an agreement with the prosecution as to the timing of discovery. The court then ordered production of *Giglio* material the day after the date of the motion hearing. The government's imposition of a plea deadline that preceded production of that material was not within Gilberti's control.

Mr. Muntasir alleges that, after receiving additional discovery in the wake of his rejection of the initial plea offer, Gilberti told him that the government was unwilling to reoffer an 84-month plea deal because "the AUSA's were 'pissed with you' for having the court order the withheld discovery material to be released." (*Id.* at 17.) Mr. Muntasir alleges that he "demanded that [Gilberti] file a petition to the court concerning the AUSA's misconduct for their failure to release the crucial discovery material and not allowing petitioner to plead to the original 84 month agreement," but that Gilberti declined to do so. (*Id.*)

Mr. Muntasir does not specifically describe the additional discovery that apparently impelled him to accede to the second plea offer. The materials discussed as awaiting production during the November 13, 2012 hearing were described as *Giglio* materials. *See* Crim. No. 12-524, ECF No. 31 at 5–8. Judge Cavanaugh, at that hearing, directed the government to produce these materials the next day. It does not appear, however, that the government was previously

under any concrete deadline for their production that Gilberti could have enforced. The Discovery Order simply required production of *Giglio* materials "sufficiently in advance of the witness's testimony to avoid delay in the trial." Crim. No. 12-524, ECF No. 12 ¶ 4. In this district, the custom is that such material is turned over no more than, and very often less than, 10 days in advance of trial.

It does not appear unreasonable, then, that the government halted efforts at production of *Giglio* materials, which were not currently due, while it believed entry of a guilty plea was imminent. No precedent to my knowledge requires production of *Giglio* materials as a prerequisite to plea bargaining. Indeed, the opposite is generally the case, because the government tends to be most open to a plea bargain before it is put to the burden of final preparation for trial, including the production of *Giglio* material. Nor is the government, which is not required to make any plea offer at all, precluded from imposing a deadline, even a very tight one, on its offer. Plea offers are a matter of executive branch discretion. The court is not empowered to compel a plea offer, or require that one remain open for any specified period of time; indeed the court is prohibited from involving itself in plea negotiations at all. *See* Fed. R. Crim. P. 11(c)(1). If Gilberti did not make a motion, then, it is likely that this was because he perceived that he had no motion to make.

Thus it does not seem that Gilberti had any meritorious basis to petition the court to keep the 84-month offer open until all discovery had been furnished. There is every indication that the government complied with all court orders concerning discovery. Accordingly, Mr. Muntasir does not show that Gilberti's failure to petition the Court for additional relief constituted ineffective assistance of counsel that caused him to sacrifice the benefit of the 84-month plea offer.

### 3. Alleged Erroneous Advice Regarding Appellate Waiver

As his third and final basis for ineffective assistance of counsel, Mr. Muntasir argues that Gilberti "was ineffective in his representation by advising petitioner that he could not address any newly discovered evidence or issues after waiving his appeal rights." This advice, says Mr. Muntasir, was incorrect; the waiver of appeal or collateral attack that is a common feature of this district's plea agreements would not encompass such matters. (ECF No. 1, Mem. of Law at 20.) Mr. Muntasir asserts that these misrepresentations caused him to withdraw from the initial plea agreement, as he wanted to preserve the ability to raise issues of any subsequently discovered evidence of prosecutorial misconduct. (*Id.* at 20–21.) He argues that Gilberti "knew, or should have known that newly discovered evidence could be addressed in a future proceeding before the court if that evidence was substantial and [a]ffected the integrity of the previous proceedings." (*Id.* at 21.)

The advice Mr. Gilberti allegedly provided was essentially correct. The guilty plea itself, in general, waives claims of antecedent violations of the defendant's rights, particularly those relating to factual guilt. *Tollett v. Henderson,* 411 U.S. 258 (1973).[10] The scope of that waiver can be supplemented, however, by an explicit agreement. Plea-agreement waivers of the rights of appeal and collateral attack, though construed narrowly, are generally valid and enforceable so long as they are entered into knowingly and voluntarily. *United States v. Castro*, 704 F.3d 125,135–36 (3d Cir. 2013); *United States v. Mabry*, 536 F.3d 231, 236–37 (3d Cir. 2008). *See generally United States v. Gwinnett*, 483 F.3d 200, 202–06 (3d Cir. 2007). If the waiver was knowing and voluntary, it is not enough, as Mr. Muntasir asserts, that any newly-discovered

---

[10]     A fundamental claim that the defendant could not validly be prosecuted, for example, a claim that the statute of conviction is unconstitutional, is an exception. *See Class v. United States,* 138 S. Ct. 798, 801 (2018). Muntasir does not claim that Gilberti misled him as to the existence or viability of any such claim.

evidence be "substantial." Rather, a litigant may subsequently bring a waived appeal or a collateral attack only if enforcement of the appellate waiver would create a miscarriage of justice. *Castro*, 704 F.3d at 135, 136; *Mabry*, 536 F.3d at 236–37. And the Third Circuit has directed that courts apply the miscarriage-of-justice exception "sparingly and without undue generosity." *Castro*, 704 F.3d at 136 (internal quotation marks omitted).

Mr. Muntasir has not described precisely the advice Mr. Gilberti gave regarding the effect of an appellate waiver. It is clear, however, that any statement to the effect that appellate waivers are generally enforceable would have been accurate. Furthermore, the Court is unaware of any precedent creating an exception to this enforceability when a litigant has received newly discovered evidence.[11] *A fortiori* new evidence of known claims (which is what Mr. Muntasir seems to have had in mind) will not undermine a waiver.[12] It would not have been ineffective to advise Mr. Muntasir that his guilty plea would continue to bind him even if he believed he had discovered new evidence.

Of course a conviction may in extreme circumstances be subject to subsequent challenge where there has been a fundamental miscarriage of justice. If Gilberti failed to advise Mr. Muntasir of this, that omission would not have risen to the level of ineffective assistance under *Strickland.* Indeed the trial court, in accepting a guilty plea, does not raise such contingent possibilities, but instead must impress upon the defendant that the plea is final and binding. This

---

[11]    Mr. Muntasir, in his reply brief, cites Federal Rules of Civil Procedure 59(e) and 60(b) as permitting motions for relief based on newly discovered evidence. (ECF No. 6 at 9.) While this may be the case, such motions are part of the Federal Rules of *Civil* Procedure, and thus do not apply in criminal proceedings, *see* Fed. R. Civ. P. 1 (defining scope of rules), and, in any case, the fact that a rule may contemplate certain relief will not overcome a litigant's waiver of the right to that relief.

[12]    I infer that Mr. Muntasir continues to have in mind the already-rejected outrageous government conduct defense or a hypothetical entrapment defense.

lapse, assuming it was a lapse, would not have undermined Mr. Muntasir's ability to make an informed decision.[13] *See Day*, 969 F.2d at 43.

Mr. Muntasir also seems to make a separate argument that Gilberti erroneously represented to him that an appellate waiver was an inherent and necessary component of a plea agreement. A plea agreement, he says, may contain a limited waiver or no appellate waiver at all. (*See* ECF No. 1, Mem. of Law at 8, 20.) Nevertheless, this plea offer did contain a waiver, as they commonly do in this district. The initial plea offer contained a broad appellate waiver, and it appears that Mr. Gilberti explained this to Mr. Muntasir. *See* Crim. No. 12-524, ECF No. 33 at 17–18. The government, like any contracting party, is the master of its offer; there is no indication that Mr. Muntasir was in any position to negotiate different terms when the government demanded a response to its offer within a few hours. Any failure to explain that an appellate waiver is not an inherent term of every plea agreement was not ineffective assistance, given that it was a term of this one. This may also be viewed as a failure to demonstrate prejudice. There is every indication that the government was in take-it-or-leave-it mode, and no indication that the government would have been receptive to negotiation on the point. Accordingly, Mr. Muntasir does not show that Gilberti's advice to him concerning the appellate waiver constituted ineffective assistance of counsel.

---

[13]      Indeed, to find that Gilberti was ineffective would create a perverse incentive to advise clients that appellate waivers might not be enforceable. Convincing a client to accept a plea with such advice would seem to present a much more compelling argument for ineffective assistance than the opposite scenario presented here.

Also glossed over by Mr. Muntasir is the lack of any practical consequence of this allegedly incomplete or defective advice. (This may alternatively be viewed as a causation issue, or as lack of prejudice.) What "new evidence" has emerged? What viable appellate or collateral claim was allegedly sacrificed by the entry of the plea? Mr. Muntasir offers nothing concrete; he expresses only an inchoate desire to keep his options open should something turn up.

## VI.    CONCLUSION

For the foregoing reasons, Mr. Muntasir's § 2255 motion will be accepted as timely. Mr. Muntasir's petition is nevertheless rejected on the merits. Although a court considering a § 2255 motion will convene an evidentiary hearing to resolve material contested issues of fact, it is apparent from the arguments before the Court and the record of the underlying criminal proceeding that, regardless of the evidence adduced at such a hearing, Mr. Muntasir would not be entitled to any relief based on his motion. *See Booth,* 432 F.3d at 545.

An appropriate order will be entered.

DATED: March 22, 2018

KEVIN MCNULTY
United States District Judge